THE BOROUGH OF EAST NEWARK, respondent,

*v.*

THE MAYOR AND ALDERMEN OF JERSEY CITY, appellant,

and

NEW JERSEY SUBURBAN WATER COMPANY and NEW YORK AND
NEW JERSEY WATER COMPANY, respondents.

[Argued March 16th and 17th, 1905. Decided November 20th, 1905.]

On appeal from a decree of the court of chancery advised by
Vice-Chancellor Stevens, whose opinion is reported in *67 N. J.
Eq. 265.*

*Mr. George L. Record* and *Mr. Robert Carey,* for the appellant.

*Messrs. Collins & Corbin* and *Mr. Herbert Boggs,* for the
respondents.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons
set forth by Vice-Chancellor Stevens in his opinion filed in the
court of chancery.

DIXON, J. (dissenting).

On July 1st, 1897, Jersey City and the borough of East New-
ark made an agreement by which the city contracted to furnish
to the borough a supply of water for the term of five years, at the
price of $90 per million gallons. The city was then receiving
water at the price of $35 per million gallons from the East
Jersey Water Company at the junction of Belleville and Kearny
avenues, and at once began to supply the borough with water

so received. The supply was conveyed to the borough in pipes laid by and wholly belonging to Jersey City. Although the contract by its terms expired on July 1st, 1902, its provisions continued to be acted upon until the filing of the bill of interpleader on which the present litigation is founded. The East Jersey Water Company was aware of this contract, but continued the delivery of the water to Jersey City at the place and on the terms above stated at least until July 7th, 1903. After that date the East Jersey Water Company, or its assigns, the New Jersey Suburban Water Company and the New York and New Jersey Water Company, delivered water in the same way, at the same point, until the filing of the bill of interpleader, claiming, however, that because of certain notices given to the borough and the city such delivery was not made to the city, but that the water was transmitted through the city pipes to the borough, and there delivered by the Suburban company directly to the borough.

The bill of interpleader was filed by the borough in November, 1903, and set forth that from the making of the contract, in 1897, until the filing of the bill, the borough had received its supply of water from the city and was ready to pay the city therefor, but that the Suburban company claimed a right to payment, at $90 per million gallons, for all water received by the borough after the giving of a notice, dated July 8th, 1903, to the effect that the water was the property of that company, and would no longer be supplied to Jersey City. The borough therefore prayed that the Suburban company and the city might be required to have their conflicting claims determined in the court of chancery.

On this bill the rival claimants were brought in and submitted to the jurisdiction of the court, which, after hearing, decreed that the fund paid into court by the borough belonged to the Suburban company, subject to compensation to the city, thereafter to be ascertained, for the use of the pipes. From this decree the city appeals.

I think the decree is wrong.

Neither the Suburban company nor its assignor, the East Jersey Company, had any contract with the borough to supply

it with water. There was an agreement, dated July 29th, 1895, between the East Jersey company and the township of Kearny, wherein the territory now composing the borough of East Newark was then embraced, under which that company was to supply the township with water for fifteen years; but that agreement contemplated that the township would lay a main to receive the supply, which was never done, and the agreement never went into operation. No right of any sort was ever acquired against the borough by reason of that contract.

The right of the water companies to deliver water into the pipe belonging to Jersey City at the junction of Belleville and Kearny avenues arose wholly out of the bargain between the city and the East Jersey company, which provided that the company should there make such delivery to the city. This right was conceded by the city and accepted by the company for the benefit of them both, and the pipe was so used from the making of the bargain until July 7th, 1903, at least. After that date no other right to use the pipe was granted by the city to anyone, and the use actually made by the company and its assignees was precisely the same as before.

These facts bring into play a principle of justice which I deem incontrovertible—that one who acquires from another the right to use the latter's property in a specified manner for the benefit of the owner cannot maintain a right to use it in the same manner for his own exclusive benefit. This principle permeates the administration of equity in all its forms, and on the strength of it the court should have determined that, without regard to the legal obligation of the companies to deliver water to the city for the supply of the borough or their right to stop such delivery, they could not be permitted, so long as they delivered water into the city's pipe for the supply of the borough, to deny that the delivery was in pursuance of their only right to do so. They should not have been allowed to maintain a claim injurious to the city on the basis of a sheer usurpation against the city.

But the usurpation did not stop with the pipe. The decree supported the claim of the water company to appropriate to

itself the benefit of the price contracted for between the city and the borough. The company set up no contract binding the borough to pay it that price; it produced no evidence (except the agreement between the city and borough) as to the value of water delivered at the borough, and yet it is decreed to be entitled to $90 per million gallons, subject only to the compensation of the city for the use of the pipe. If the usurpation. of the pipe was maintained, then the inquiry should have been, what, in the absence of a contract price between the borough and the company, was the real value of the water delivered to the borough? If the value was ascertained to be less than the price paid into court by the borough as due from it to the city, then the difference should have been awarded to the city, beside compensation for the use of the pipe. If, however, the value was ascertained to be equal to the price, then, on the evidence presented in the case, the reasoning must, I think, have followed these lines: In its natural position the water had little value; when brought to the junction of Belleville and Kearny avenues it had acquired a value of $35 per million gallons, this being the price at which the company had supplied it to Jersey City at that place for many years, and there being no other evidence of value; when it reached the point of supply to the borough its value had become $90 per million gallons, the price bargained between the city and borough being the sole evidence which the case affords on that subject; the difference in value between the water in its natural position and the water at the junction of the avenues can have no just basis except the cost of transportation and a reasonable profit thereon; and the same thing is true with regard to the difference in value accruing between the junction of the avenues and the point of delivery to the borough; but between the points last named the water was transported by the appliances belonging to Jersey City, and there existed no other means for such transportation; to the city, therefore, belonged the cost of that transfer and a reasonable profit thereon, namely, the difference between $35 and $90 per million gallons. A consideration of the cost of laying and maintaining the city's pipe, its probable durability and the uncertainty as to the period for which its use might be required,

leads me to the conclusion that compensation made to the city on that footing would not be excessive.

So that, whether the water company be precluded from denying that it delivered the water at the junction of the avenues to Jersey City, which is, in my opinion, the basis on which the decree should rest, or the city be deemed entitled to compensation for the use of the pipe, the court should have awarded the fund to the city.

The case may be viewed in another aspect.

When the water company notified the borough of its intention to deliver water directly to the borough through the pipes of the city, it gave Jersey City like notice, and the city replied that it would not consent thereto, but insisted on a delivery to the city at the junction of the avenues.

The pipes from that junction to the borough were the private property of the city and were the only medium in existence for the delivery of a supply of water to the borough. Unless we assume that the engagements between the city and the borough, on one hand, and between the city and the water company, on the other, imposed on the city the obligation to have water passed through its pipes pursuant to those engagements, the city owed no duty whatever to either the borough or the company to permit its pipes to be used for any purpose. The city's reply to the notice of the company was in effect that the company could continue the use of the pipes only on the terms stated in those engagements. If at that time the company had appealed to the chancellor to fix some other terms for such use, must he not have answered: "If you have no power of eminent domain, you cannot use the city's private property, except on the terms prescribed to you by the city. If you have the power of eminent domain, you must exercise it according to the statute and under the constitutional prohibition that private corporations shall not be authorized to take private property for public use without just compensation *first* made to the owners. Until you have thus exercised the power and made due compensation, you cannot be authorized to use the city's pipes except on the city's terms."

I do not perceive how such an answer could have been avoided, nor how the company's position can be bettered by the fact that

it chose to usurp the property first and appeal to the chancellor afterwards.

I think the decree should be reversed.

*For affirmance*—THE CHIEF-JUSTICE, FORT, GARRETSON, PITNEY, SWAYZE, BOGERT, VREDENBURGH, VROOM, GREEN, GRAY —10.

*For reversal*—DIXON, GARRISON—2.